IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.     CRIMINAL ACTION NO.   3:21-00061

DAVID FERRUSQUIA-SANCHEZ

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant David Ferrusquia-Sanchez's (Defendant) Motion to Suppress. ECF No. 34. The Court held a Motion Hearing on October 14, 2021, to take evidence and hear arguments. The Court directed the parties to file supplemental memoranda on the issues presented at the hearing. Having considered the testimony and arguments heard at the hearing, as well as the arguments contained in the memoranda, the Court **DENIES** the Motion.

## BACKGROUND

The facts of this matter are undisputed. On March 22, 2021, Defendant was driving eastbound on I-64 in Putnam County in a gold Chrysler 200 with the West Virginia plate numbered 85J910. Officer Wilson (Ofc. Wilson) called this plate number in to dispatch, which confirmed that the registration had no matching record. Ofc. Wilson also observed that the vehicle was following too closely to a tractor trailer. Based on these factors, Ofc. Wilson pulled the vehicle over at 5:16 PM.

When Ofc. Wilson began routinely conducting the traffic stop, he noticed there was a language barrier when communicating with Defendant. He asked for Defendant's identification, and Defendant provided a Mexico passport, a Mexico driver's license, and an additional foreign identification. Ofc. Wilson then contacted Immigration and Customs Enforcement (ICE)

Deportation Officer Gary Olcott (DO Olcott), advised him of the traffic stop, and sent DO Olcott pictures of Defendant's documentation to verify their authenticity. This call occurred approximately four minutes into the traffic stop. Over the phone, DO Olcott informed Ofc. Wilson that he was familiar with Defendant from a 2015 investigation and that he knew Defendant to be associated with firearms. DO Olcott advised Ofc. Wilson that he knew that Defendant was previously an illegal alien, but that he would inquire into Defendant's current legal status in the United States. Within a few minutes, DO Olcott confirmed with Ofc. Wilson that Defendant was still an illegal alien. DO Olcott arrived on the scene approximately 25 minutes later.

While waiting for DO Olcott to arrive on the scene, Ofc. Wilson continued conducting the traffic stop. He ran Defendant's information through Putnam County 911, which was how Ofc. Wilson learned that there was an active capias warrant against Defendant for driving with a revoked status. The other officer with Ofc. Wilson observed a shotgun shell on the front passenger floorboard. Additionally, a K-9 unit from the Hurricane Police Department arrived on scene. A handler with a dog walked around the perimeter of the vehicle and the dog indicated positive to the presence of illegal narcotics. Because of this positive hit, Defendant's vehicle was searched. Although the search did not turn up any illegal narcotics, a loaded 9mm Sportarms pistol (SN: 378234) was recovered in a duffel bag behind the driver's seat and Federal 9mm bullets were found in the rear passenger door.

Defendant was arrested at 5:27 PM. DO Olcott arrived on the scene around 5:45 and again confirmed that Defendant had an illegal status and was therefore prohibited from possessing a firearm. In a later *Mirandized* interview, Defendant admitted to possessing the firearm.

## DISCUSSION

The Court will turn to each step of the encounter and analyze whether the officers' actions during the stop of Defendant on March 22, 2021, violated Defendant's constitutional rights.

1. <u>Ofc. Wilson was justified in initiating the stop of Defendant's vehicle</u>

The temporary detention of a person during the course of a vehicle stop constitutes a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the Court will inquire whether the officer's action was justified at the inception of the stop and whether the officer's actions after the stop were "reasonably related in scope to the circumstances that justified the stop." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). An officer is justified in initiating such a stop when an officer observes a traffic violation. *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). And, because the standard for determining whether an officer was justified in initiating a stop is an objective one, relying only on the objective facts and circumstances of the stop, even a minor traffic offense is sufficient to justify an officer's stop of a vehicle. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). So long as there is an objective basis for the stop, "regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity," it is justified. *Id.*

Ofc. Wilson observed Defendant's vehicle driving eastbound on I-64 in Putnam County with a license plate numbered 85J910. When he called this plate number in to dispatch, it was confirmed that the registration had no matching record. This is different from a situation where a registration had simply expired, as the record would indicate the date of expiration. Further, Ofc. Wilson observed that Defendant's vehicle was following too closely to a tractor trailer. These observations serve as the basis for the justification of the stop.

Defendant argues that the officers lacked the reasonable suspicion of these offenses at the time that they initiated the stop. However, Ofc. Wilson testified at the Motion Hearing on October 14, 2021, that he called the plates in to dispatch and learned that the registration had no matching record before initiating the traffic stop. Defendant acknowledges that driving without a valid registration and following too closely are traffic offenses under West Virginia law. *Def.'s Br. in Supp. of Mot. to Suppress*, ECF No. 34, at 3. Beyond merely stating that the officers lacked reasonable suspicion, Defendant provides no basis for this position. Therefore, the justification for the stop existed at the time the stop was initiated.

2. Ofc. Wilson was justified in contacting DO Olcott to inquire into Defendant's legal status

Pursuant to a lawful vehicle stop, an officer may detain the vehicle for as long as necessary to "perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335. The legal duration of such a stop is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop… and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). The stop cannot lawfully last longer than is necessary to investigate the traffic violation. *Id.* Permissible inquiries are those that are incident to the stop, such as to check the "driver's license and vehicle registration, run a computer check, and issue a citation," but without a reasonable suspicion of any further criminal activity, detaining a person to investigate beyond the scope of the purpose for the stop is illegal. *Rusher*, 966 F.2d at 876; *Rodriguez*, 575 U.S. at 355; *United States v. Palmer*, 820 F.3d 640, 649–50 (4th Cir. 2016) (finding that an officer cannot prolong a stop to investigate beyond the scope of the initial stop "unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity"). Inquiries unrelated to the mission of the stop are only permitted where such inquiries do not "measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (quoting

*Arizona v. Johnson*, 555 U.S. 323, 327–28 (2009)). Otherwise, an officer needs some reasonable suspicion to justify the additional inquiry. *Id.*

Defendant argues that Ofc. Wilson's call to DO Olcott to inquire as to Defendant's legal status was beyond the scope of the mission of the initial traffic in violation of the Fourth Amendment. Defendant further argues that this call prolonged the stop and that Ofc. Wilson lacked reasonable suspicion of a criminal activity to justify it. However, the Fourth Circuit has noted that a call to ICE to inquire into the validity of foreign documents "is analogous in many ways to how an officer routinely runs a driver's license and registration to check their validity." *United States v. Guijon-Ortiz*, 660 F.3d 757, 769 (4th Cir. 2011). When an officer is presented with a driver's license, they are entitled to check the validity of the license. *See Rusher*, 966 F.2d at 876. Further, the officer is entitled to check the driver's criminal history in the interest of officer safety. *See United States v. Soriano-Jarquin*, 492 F.3d 495, 500–01 (4th Cir. 2007).

Ofc. Wilson's call to DO Olcott did not deter him from the investigation of the traffic violation, but rather, it was in furtherance of that investigation as a routine matter. When an officer is given foreign documents in response to a request for identification, checking the validity of such documents is tantamount to checking the validity of a driver's license. This is precisely what Ofc. Wilson did—he called DO Olcott to verify the validity of the foreign documents voluntarily handed to him by Defendant. The call to DO Olcott, like the check of a driver's license, "serve[d] the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355. This call was not an impermissible deviation from the mission of the stop, investigating for "ordinary criminal wrongdoing," as Defendant argues. *See Rodriguez*, 531 U.S. at 355 (citation omitted). The call served the same

purpose as a check of a driver's license and was permissible as it pertained to the mission of the stop.

    3.  <u>The Government had no notice regarding the challenge to the dog sniff</u>

At the hearing, Defendant questioned Ofc. Wilson about the handling of the police dog that performed the sniff search of Defendant's vehicle. Then, in the Supplemental Memorandum in Support of Motion to Suppress Evidence, Defendant sought to challenge the dog sniff. *Def.'s Supp. Br. in Supp. of Mot. to Suppress*, ECF No. 45, at 5. This argument was not in the original Motion. Further, the Government had no notice about the potential challenge of the dog sniff, so the handler was not present at the hearing. Defendant similarly did not seek the testimony of the dog handler at the hearing.

Further, the dog sniff search did not impermissibly extend or prolong the duration of the stop. *Branch*, 537 F.3d at 335 ("A canine sniff is also constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation." (citing *Caballes*, 543 U.S. at 407)). Before the Hurricane Police Department's K-9 unit arrived, Ofc. Wilson spoke to DO Olcott regarding Defendant's illegal status. This conversation gave Ofc. Wilson the reasonable suspicion to investigate Defendant's legal status further. In pursuit of this investigation, Ofc. Wilson waited for DO Olcott to confirm Defendant's legal status and to arrive at the scene of the stop. Ofc. Wilson also pursued an investigation into the active capias warrant against Defendant around the time that the K-9 unit arrived and conducted the sniff search. The sniff search occurred during these ongoing, concurrent investigations into Defendant's illegal status and the verification of Defendant's identity with respect to the capias warrant; therefore, the search was permissible.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion. ECF No. 34.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

      ENTER:    December 1, 2021

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE